Cruger *v.* Cruger.

———————————

SAME TERM.    *Strong, Hurlbut, and Edwards*, Justices.

HENRY D. CRUGER *vs.* HARRIET D. CRUGER, GEORGE DOUG-
LASS and WILLIAM DOUGLASS.

HARRIET D. CRUGER, by William Douglass, her next friend,
*vs.* HENRY D. CRUGER.

A husband, by a post-nuptial settlement, made on the 29th of June, 1833, reciting that he had, by means of his marriage, acquired certain interests and rights in his wife's property, released and conveyed all the estate, both real and personal, and all his right, title and interest in such property to trustees, in trust to hold and keep both the principal and interest thereof during marriage,

Cruger *v.* Cruger.

exempt from his debts, contracts, or control, to be managed and disposed of on his wife's separate orders or receipts, or by her deeds or will, so that she might enjoy and dispose of the same in all respects as if she were unmarried. *Held* that by this conveyance the husband's right to the personal estate, and the possession and the income of the real estate, passed to the trustees. That the husband could not convey, in that manner, the right to dispose of the fee in the real estate at any time, nor of the rents and profits after his decease; and that those rights were unaffected by the deed of settlement, and remained the same as if no such instrument had been made.

*Held also*, that the wife's interest in her personal property was neither "future nor contingent." That she had the absolute right of disposal of both principal and interest; and that there being nothing in the deed of settlement providing for the accumulation of the income, or suspending the absolute ownership beyond the period of two lives in being, it did not militate against any provision of the revised statutes, and was valid by the rules of the common law.

*Held further,* that the absolute right of disposal, as to such personal property, gave to the wife the power to convey the principal, or the income only, or any part of either.

And the wife having, in pursuance of the power of appointment contained in such deed of settlement, by deed dated November 19, 1841, conveyed to her husband, for life, the one equal half part of the net income of her separate fortune and estate, both real and personal; *Held* that such deed did not confer upon the husband any right to receive any part of the future rents and profits of her real estate; but that so far as such deed related to the income of the personal estate, it was authorized by the terms of the post-nuptial settlement.

*Held also*, that such deed from the wife to her husband was not a conveyance of the half of two distinct subjects, but that it conveyed the half of the whole income, as one subject matter; and that if the wife had power to convey so much of her income, from whatever source derived, the instrument would operate upon that part of it; especially as that construction would the best effectuate the intention of the parties, at the time when the transaction took place. And that such deed, if free from other objections, must be adjudged to convey to the husband the income arising from the personal estate, to the extent of one half of the net income of her whole estate, real and personal.

A feme covert, having a separate estate, subject to her own disposal, may give it to her husband, as well as to any other person, if her disposition of it be *free*, and not the result of flattery, or force, or improper treatment.

It is not wrong for the husband to endeavor, by his own reasoning, and the persuasion of his wife's friends, to prevail upon her to make a reasonable disposition of a part of the income of her separate estate, for his benefit.

It is not necessary that the act of the wife should be spontaneous, or that she should adopt the instrument executed by her, through the unaided impulses of her own mind.

Although a wife, in making a disposition of a part of her income for the benefit of her husband, acts in opposition to sentiments which she has long cherished,

Cruger v. Cruger.

yet such disposi... ...ll be free, within the principle, if she eventually executes the deed through the deliberate convictions of her own mind; whether produced by her own reflections, or the suggestions and advice of her friends.

Where a deed, executed by a married woman in favor of her husband, was reasonable in its terms; was the result of an arrangement made through the advice of the wife's nearest relatives and friends; was drawn by her counsel; was executed in pursuance of what appeared to be her convictions of right, at the time; and was acknowledged by her to be her free act and deed, done without any fear or compulsion of her husband; and there was no fraud or imposition practiced upon her, the court refused to set the same aside, upon a bill filed by her for that purpose.

Upon every sound principle of construction a reference to a term used in a statute must be in its direct and primary sense as expressly defined, and not in an assimilated interpretation. And this rule is more especially applicable when the express meaning will accomplish all that was designed by the framers of the law. *Per* STRONG, P. J.

IN EQUITY. These causes came before this court on appeal from a decree of the late vice chancellor of the first circuit, made upon an original and a cross-bill. The original bill was filed by Mr. Cruger against his wife, and her two brothers, the trustees of her estate, for the purpose of setting aside a deed of settlement executed by Mr. Cruger on the 29th of June, 1833, immediately after the solemnization of the marriage between him and his wife, which purported to convey to the trustees all her estate, real and personal, in trust for her use, and subject to her appointment and disposal. Or, in case it should be decided that the property was held by the trustees under a valid subsisting trust, then that the plaintiff might have the benefit of a deed of appointment executed by Mrs. Cruger, on the 19th of November, 1841, which purported to give to him one half of the net income of her estate, during his natural life. The bill prayed that the deed of settlement might be decreed to be null and void, and insufficient to bar the husband's marital rights in the personal estate of his wife, or in the rents and profits of her real estate; that the trustees might be enjoined from further meddling or interfering with the property; that they might be decreed to account to the plaintiff for all dividends, rents, interest money, &c. received, expended or reinvested by them while acting as trustees, and to pay over to the plaintiff whatever

Cruger *v.* Cruger.

should be found due to him, upon such accounting, and to deliver up to him all books, papers, securities, &c. relating to the estate; that they might also be decreed to let the plaintiff into the possession, use, and enjoyment of the real estate, and to assign and convey such parts thereof as stood in their names as trustees, to Mrs. Cruger, to the end that the plaintiff might have his rights over the same as her husband. But that in case the trustees, in the opinion of the court, had full power and authority under the deed of settlement, to act as such trustees, that they might be directed and required forthwith to proceed to demand and recover from George Douglass, one of the defendants, the property in his hands belonging to Mrs. Cruger, and to collect in the same and invest it so as to be productive; that they might be required to convert all of the principal of the estate into productive property, and to manage the same so as to yield the most income; that they might be ordered to collect in, and pay over to the plaintiff, such arrearages of the income as might be outstanding; that a receiver of the estate might be appointed, and that the trustees might be directed to transfer and deliver to him, upon oath, all the property and effects belonging to the estate, and all books and papers relating thereto; that the trustees might be enjoined from meddling with the estate, or the income thereof, and that they might be removed from the trust, and other trustees be appointed in their stead. The deed of settlement which was sought to be set aside by this bill was as follows:

" A marriage having been solemnized between Henry N. Cruger, junior, and Harriet Douglass, by means whereof he has acquired at law certain interests and rights in her property, the said Henry N. Cruger, junior, hereby freely, fully, and unreservedly releases and conveys all the estate, both real and personal, heretofore owned by her, or which she may hereafter acquire, and all his right, title, and interest therein, to George Douglass, William Douglass, James Monroe, and Robert Halliday, and to such substitutes as she may from time to time appoint, jointly and severally in trust to hold and keep both the principal and interest thereof during the said marriage, exempt

from his debts, contracts, or control, to be managed and disposed of on her separate orders or receipts, or by her deeds or will, so that she may enjoy and dispose of the same, as it came from her parents and sister, or may hereafter in any manner accrue to her, in all respects as if she were unmarried. In witness whereof, the said Henry N. Cruger, junior, has hereunto set his hand and seal, at the city of New-York, this twenty-ninth day of June, in the year of our Lord one thousand eight hundred and thirty-three.

H. N. CRUGER, Jr." [L. S.]

It appeared that at some time between the date of this deed and February, 1835, Mr. Cruger altered his name from "Henry N. Cruger, jun." to "Henry D. Cruger." Previous to the commencement of these suits, Robert Halliday, one of the trustees named in this deed, had died, and Mr. Monroe had resigned his trust. Soon after the marriage, Mrs. Cruger signed and delivered the following order, in duplicate, one to the trustees, and the other to the plaintiff:

"Bloomingdale, 15 July, 1833.

To Robert Halliday, Esq.

As acting trustee and agent of my property, you are hereby authorized and requested to pay to Mr. Cruger, upon his written order or receipt, the income of my estate as it accrues. Signed with all the heart of

HARRIET CRUGER."

Several other appointments, gifts, or conveyances were made by Mrs. Cruger in favor of her husband, between the time of the execution of the deed of settlement and the 19th of Nov. 1841, which it is not necessary to mention here, as they are referred to in the opinion of the vice chancellor. The deed of appointment executed by Mrs. Cruger on the 19th of November, 1841, which was sought to be established in this suit, was in the following words:

"Know all men by these presents, that I, Harriet D. Cruger, the wife of Henry D. Cruger, Esquire, by virtue and in pursu-

ance of the power and authority in that behalf contained in
my post-nuptial settlement with him, and by virtue and in pur-
suance of every other power and authority enabling me so to
do, and for divers good and sufficient causes and considerations
me thereunto moving, have irrevocably assigned, transferred,
limited, and appropriated, and in and by these presents, I do
irrevocably assign, transfer, limit and appoint to my said hus-
band, for and during the rest, residue, and remainder of his
natural life, the one equal half part of the net income of all
and singular my separate fortune and estate, both real and
personal, commencing on the first day of November instant, in-
clusive, which provision hereby made for him by me is not to
be construed as impairing, or in any way affecting, any provis-
ion which I have made, or which at any time or times hereaf-
ter I may make for him, in and by my last will and testament,
or other instrument of appointment, in the nature thereof.
But the provision hereby made is to be accepted by him, and is
intended by me, in lieu of the provision of an annuity of three
thousand dollars which I made for him in and by a certain in-
strument, executed under my hand and seal the seventh day
of September, in the year one thousand eight hundred and
forty.   And I do hereby fully authorize and direct my trustees,
under the said settlement, or the agent for the time being of
my estate, to pay to the said Henry D. Cruger the said equal
half part or moiety of the net income of my said fortune and
estate during the residue of his natural life.   And I do hereby
assume upon myself the collection of all debts, dues, and de-
mands due or belonging to me or my estate.   And I do hereby
fully acquit, exonerate, and discharge the said Henry D. Cru-
ger, his heirs, executors, and administrators, of and from all
debts, dues, claims and demands, now due or owing by him to
me, or my said trustees, or estate, and all further or future re-
sponsibility or liability touching the same, or any part or parts
thereof.   In witness whereof I have to these presents set my
hand and seal, this nineteenth day of November, in the year
of our Lord one thousand eight hundred and forty-one.

> HARRIET DOUGLASS CRUGER." [L. S.]

This deed was acknowledged by the grantor before a commissioner, in the form required by law as to deeds by married women, on the day after its date.

The cross-bill was filed by Mrs. Cruger against her husband, for the purpose of establishing the deed of settlement executed by him upon the marriage of the parties, by virtue of which she claimed that the whole of her estate, both real and personal, became vested in the trustees, in trust for her, and subject to her appointment and disposal as if she were unmarried ; to be held and kept by them during the marriage, entirely exempt from her husband's control. The bill also sought to annul and have declared void all appointments and settlements of the income which she had made, upon or in favor of her husband, and especially the last act or deed of the kind, the above mentioned deed of the 19th of November, 1841, under the circumstances, and for the reasons stated in the cross-bill, and in the opinion of the vice chancellor. Answers were put in, by the defendants, in each suit, and replications were filed and proofs taken, and the causes were heard together. On the 17th of December, 1845, the vice chancellor made a decree in both suits, declaring the deed executed by Mr. Cruger on the 29th of June, 1833, to be valid and effectual as a marriage settlement ; that the verbal gift alleged to have been made by Mrs. Cruger to her husband on the day of their marriage was only intended as a revocable nuncupative will, and was void and inoperative for any purpose ; that the order in writing subscribed by Mrs. Cruger, dated July 15, 1833, on the then acting trustee of her estate to pay the income to her husband as it should accrue, was not an appointment or authority vesting in him the said income, but was merely an authority to the acting trustee to pay over such income to Mr. Cruger as an agent in that behalf, for disbursement, according to the trusts of the marriage settlement, and was revocable at the will and pleasure of Mrs. Cruger ; that the several alleged appointments, gifts, or conveyances of property or income to or for the use of Mr. Cruger, respectively bearing date June 29, 1835, July 27, 1836, November 27, 1836, November 30, 1836, October 26, 1839, November

Cruger *v.* Cruger.

2, 1839, May 13, 1840, and September 7, 1840, had become and were inoperative and of no force or effect, and that the same, and each, and every of them ought not to be executed or enforced by the court; that the deed of the 19th of November, 1841, executed by Mrs. Cruger, was a good and valid appointment under the power contained in the deed of settlement; and that Mr. Cruger was entitled, under the same, to the one-half of the net income of the estate of Mrs. Cruger, for his life, irrevocable by her. It was further declared, what portions of her estate were embraced in that deed and within its operation; and it was declared, adjudged and decreed that Mr. Cruger was entitled to an account of one-half of the net income of the real and personal estate of his wife, except of those parts declared not to be embraced in the deed; and a reference to a master to take such account was ordered. The decree directed that in taking such account, Mr. Cruger should be charged with whatever moneys, if any, he had received for principal and interest of the several loans to his brother; that the trustees should, out of the income of the estate, pay to Mr. Cruger, forthwith, $2500, and that from and after the 1st of November, 1845, they should account with and pay over to him from time to time, semi-annually during the rest of his life, one-half of the said net income of the estate, real and personal, so adjudged and decreed to him, as the same should accrue and be collected by them. And the question of costs, and all further questions and directions, were reserved until the coming in of the master's report.

Mrs. Cruger, and the trustees of her estate, appealed from so much of this decree as declared the deed of the 19th of November, 1841, a good and valid appointment under the power contained in the deed of settlement; from all and every part thereof subsequent to the provision respecting that deed; and from the whole of the decree except what precedes that provision. And Mrs. Cruger, by William Douglass her next friend, as complainant in the cross-bill, appealed from the same parts of the decree.

The facts in the case, as they appeared from the pleadings

Cruger *v.* Cruger..

and proofs, are very fully stated in the annexed opinion of the vice chancellor.

W. T. McCoun, V. C.  The bill in the original cause is filed by Mr. Cruger against his wife, and her two brothers, who claim to be trustees of her estate, for the purpose, in one aspect, of ridding the estate of the trust, in order that there may be no obstacle in the way of his asserting the common law rights of a husband to the property of his wife; or in case it shall turn out that there is a valid subsisting trust under which the property is held, then that he may have the benefit of a deed of appointment executed by her under the date of the 19th of November, 1841, purporting to give him one-half of the net income of the whole estate, real and personal, during his natural life: and the bill calls upon the two brothers of his wife, either to yield the possession of the property to him, to be managed as a husband is entitled by law to manage, possess and enjoy the property of his wife; or else in their capacity of trustees, to perform their duty in respect to the making of investments, the collection of rents and income, the paying of dividends, and the rendering of proper accounts; or that they may be removed from the trust, and other trustees be appointed in their stead.

On the other side, the cross-bill filed by Mrs. Cruger against her husband, has for its object, first, the establishment, by decree of this court, of a deed of settlement executed by him immediately after the solemnization of their marriage, on the 29th of June, 1833, by which she claims that the whole estate, both real and personal, became and was vested in trustees for her use, and subject to her appointment and disposal as if she were unmarried, and to be held and kept during the marriage entirely exempt from his control; and secondly, it seeks to annul and have declared void all appointments and settlements of the income which she at any time may have made upon or in favor of her husband, and especially the last act or deed of the kind, executed by her under date of the 19th of November, 1841 before mentioned.

This presents a very general view of the nature and object

of the suit on both sides; and it will be readily perceived that this court can deal with the controversy, only so far as property is concerned. Over the conduct and acts of the parties, except with reference to their respective rights of property, and for the purpose of enforcing those rights when ascertained, this court can exercise no control. It has not jurisdiction to compel cohabitation, where one party withdraws from the society of the other without justifiable cause, nor to decree a restitution of conjugal rights withheld. Whether the decision I am about to make, will have a tendency to produce such desirable results from any moral force or influence it may carry with it, I cannot undertake to predict; but I will indulge the hope that the questions which have so long agitated the minds of the parties in relation to the property, being once settled, by a definitive sentence or decree upon just and equitable principles, there will be nothing left to disturb the peace and harmony that always should subsist between intelligent, upright and virtuous minds, and that they will see the importance of returning to those duties which the domestic relation requires, and which, as enlightened members of a moral and christian community is demanded of them.

The first question to be considered is, upon the validity and effect of the husband's deed of the 29th of June 1833, as constituting a post-nuptial settlement of the property upon the wife. The whole of the property belonged to her before the marriage, and the absence of any thing in the shape of a marriage settlement would leave him to enjoy the legal rights of a husband over her property which could not be disputed.

Much, therefore, depends upon this instrument; for if it cannot be sustained of itself, or as an evidence of an ante-nuptial agreement, which the court is bound to carry into effect, then all the court has to do is to pronounce it a nullity, and leave the husband in the possession of the rights conferred upon him by the marriage. In the first place, the instrument is alleged to be void upon its face, for the reason that there is no consideration expressed.

The statute relative to fraudulent conveyances, (2 *R. S.*

Cruger *v.* Cruger.

134, 135,) does indeed require that certain contracts or agreements, in order to be binding, must be in writing, and must *express the consideration*, and must be subscribed by the party, or his agent; but this provision of the statute has reference to *executory* contracts or agreements, such as rest in covenant or promise to do or perform some act in future, and does not apply to contracts *executed* by the act or deed itself. This is manifest from another section of the same statute: "No estate or interest in lands, (other than leases for a year,) nor any *trust* or *power* over or concerning lands, or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a *deed* or *conveyance in writing*, subscribed by the party creating, granting, assigning, surrendering or declaring the same," &c. Here no mention is made of a consideration *expressed*. In an instrument, therefore, which of itself creates and passes the estate, title or interest, by words of grant, assignment, surrender or declaration of trust, it is not necessary that it should express the consideration on which it is founded. A consideration is *implied* from the fact of the party's signing and sealing the instrument; and this is sufficient to support it as a deed, until it is impeached or invalidated for some other cause. Now the deed in question is not in terms *executory* or *promissory*. It is not a covenant or agreement to do something in future, but it is an act or deed by which all that was ever contemplated is done and accomplished at once. It speaks in the *present*, not in the *future* tense. It purports to divest the husband of all his interest and right in his wife's property which he had acquired at law by the marriage, and to vest it in trustees for her separate use. The language of the deed is, that he thereby freely, fully and unreservedly releases and conveys all the estate both real and personal of the wife, which she then owned or might afterwards acquire, and all his right, title and interest therein, &c. It is therefore an executed, not an *executory* instrument, and does not belong to that class of written instruments which are declared void by the statute of frauds, for not expressing the consideration.

The next objection taken to this instrument is, that if not void for want of an express consideration, still that it is void by the statute of *uses and trusts*, as containing a trust not sanctioned by that statute. (1 *R. S.* 727, § 55.) The trust as declared is that the trustees are " to hold and keep both the principal and interest thereof (that is, of the whole estate,) during the said marriage, exempt from his (the husband's) debts, contracts, or control; to be managed and disposed of on her separate orders or receipts, or by her deeds or will, so that she may enjoy and dispose of the same, as it came from her parents and sister, or may hereafter in any manner accrue to her, in all respects as if she were unmarried." In the matter of *time* or *duration* the trust is not objectionable ; for it is to continue only during the marriage of the parties, and by no possibility can this extend beyond the life of the wife. The objection, however, rests upon a more formidable ground, viz : that by the terms of the deed the trustees are not required to perform any active duties in the management of the estate, or in the receipt of the rents and profits, and the application of them to the use of the wife, but the wife herself, instead of being a mere recipient or passive party, is constituted the active party in the *trust*, to manage the property in all respects as the legal owner. That such a mere *nominal trust* is contrary to the policy of the law, and the spirit and intention of the statute, is not now to be questioned. The final decision in the case of the Lorillard will, and in other cases subsequently, has settled that point. The question is whether the trust here created, or intended so to be, is of that character. It must be admitted that the deed is informal, and the trust inartificially expressed ; but it does not follow that it will be disregarded on that account, as entirely ineffectual. This court looks at the substance rather than at the form of things, and endeavors to ascertain the object and design of every deed or instrument brought before it. If the words used admit of different meanings, by one of which the instrument may be good, and by another void, the duty of the court is to attach to them the meaning that will uphold, rather than the one which will overthrow

the deed. The words of strongest import against the validity of the trust in question, are these : " To be managed or disposed of on her separate orders or receipts, or by her deeds or will, so that she enjoy the same in all respects as if she were unmarried," carrying with them the appearance of an intention to place the whole property in her possession, and to leave it to her management as well as at her ultimate disposal, as though she were a *feme sole*, and as though trustees were but nominal parties in the deed, and had no duties to perform : but when these words are read in connection, as they must be, with those that precede them, a different sense is conveyed. The words that precede are words of release and conveyance to third persons by name. They are sufficient to pass whatever legal interests or rights of property the husband had acquired in the estate of his wife by the marriage, and the trustees became vested with those rights by the delivery and acceptance of the deed. (11 *Wend.* 247, 248.) From that moment their duty as trustees commenced. It was an active trust they were called upon to execute—a trust in the first place " to hold and keep both principal and interest of the whole estate during the marriage exempt from the husband's debts, contracts, or control." How could they hold and keep, and protect the property, and especially the income, from the husband, and against his creditors, without taking it into their own hands and under their control ? To leave it in the possession of the wife and under her management would be to leave it still in the husband's possession and under his control. Her possession would in legal contemplation be his possession, and the declared object of the deed might therefore be defeated. It must not be supposed that the parties intended such a result. On the contrary it was as necessary to vest the trustees with the actual possession as with the legal title ; and both being united in them, the active management of the estate at once devolved on the trustees, one of whom (Mr. Halliday,) immediately entered upon the duties of the trust, and did in fact take charge of and manage the estate. So far therefore as respects the commencement of the trust clause in the deed, viz : " to hold

and keep the property," &c. for the purpose of protecting it against the acts of the husband himself, it appears to be free from the objection that no active duties on the part of the trustees were required.

Do the words, then, which immediately follow, " to be managed and disposed of on her separate orders or receipts," &c. take from it that character? In my opinion they do not. It is very evident they were not intended to relieve the trustees of their duties, and to convert them into mere automata, or nominal parties to the trust. No such meaning ought to be given to the words, and the whole, taken together, ought not to bear that construction. A more consistent and rational understanding of them is, that they were meant to designate the wife as the sole beneficiary of the trust—to point out very generally the manner by which she might receive and enjoy the benefit of the property free from his control, viz : by orders on the trustees, and receipts to them in her own name, and by ultimately disposing of the estate as she might see fit. The latter is in the nature of a power of appointment, to be exercised by deed or by will. Still the question is not wholly disposed of; for although one objection is removed, another remains. The trust as declared is not in the words of the statute, " to receive the rents and profits, and apply them to the use of the wife." It has been held repeatedly not to be essential to the validity of the trust that it should be expressed in the very words of the statute. A deviation in the phraseology will not vitiate, provided the object of the statute is substantially complied with, (*see Gott* v. *Cook,* 7 *Paige,* 538, 539 ;) and here I think there is a substantial compliance with the statute. It follows, from the nature of the trust, that the trustees must receive the rents and profits. This, as already shown, is a part of the active duty belonging to the trustees, to hold and keep both the principal and interest exempt from the husband's debts, contracts, or control, and when the money is paid over upon the wife's separate orders or receipts, it is applied to her use within the meaning of the statute. (*Gott* v. *Cook, supra.*)

Cruger *v.* Cruger.

I have thus far considered the question upon the law of trusts, in relation to *real* estate ; the statute of uses and trusts having reference solely to that species of property.   But with regard to the personal property embraced by the same deed of settlement, it will be perceived that the trust is equally free from any well founded objection.   We have no statute declaring how, or for what purposes personal property shall or may be placed in *trust,* nor imposing any restriction upon trusts of *personalty,* except *trusts* of *accumulation* for the benefit of minors, which are to be limited to their respective minorities, and all beyond that period are made void.   There is a statute also against *suspending* the *absolute ownership* of personal property beyond the period of *two lives in being,* and by which, moreover, *limitations* of future and contingent interests in personal property are subjected to the same rules as prescribed by another statute in relation to future estates in lands; but none of these statutory provisions touch the deed in question.   There is here no trust for the purpose of accumulation—nothing that operates as an *undue* suspension of the absolute ownership of property ; and no violation of the rules of law in regard to future or contingent estate.

If I am correct in holding this to be a valid deed of settlement upon its face, and the *trust* such as upon a fair construction the law has not prohibited, then it becomes unnecessary to determine whether there was or was not, an *agreement,* ante-nuptial, on which it was founded.   The parties are at issue on that point.   The wife claims for the deed that it was executed in pursuance of a previous agreement or understanding, which formed a condition on which she entered into the marriage compact ; and that however informal or defective the instrument might prove to be, there being ample consideration in the fact of a previous agreement, this court will reform the deed if necessary, and sustain and establish it as a valid settlement upon her.   On the other hand the husband denies that any previous agreement existed for a settlement, as a condition of the marriage or otherwise ; and he asserts that the deed as executed and delivered, was a voluntary offering on his part.

The proofs in the cause do not furnish direct and positive evidence of a previous agreement, by which the property was to be settled upon the wife after the marriage. In all probability it was a point about which they had not specifically agreed, although a wife's right to retain the control and exclusive ownership of her estate after marriage, had been often, and for a long time, a subject of discussion between them. She had been taught to believe in the superiority of the wife's right in that respect over the *marital* right which the common law confers upon the husband ; and she appears to have adopted it as a fixed principle in relation to her property, never to surrender the control and ownership of it to a husband, any further than to allow him to enjoy the income with herself, and to be a disbursing agent of it, for their mutual benefit. To this, as a principle of her life, she has clung ever since the marriage, even at the sacrifice of her domestic peace and happiness. Still I believe the marriage took place without having that point conceded to her ; but as I have no doubt, under the fullest persuasion in her own mind, that her husband, understanding as he did her sentiments upon the subject, would fulfil that expectation, and relinquish the right which the law would give him over her property ; and that knowing her wishes, and actuated by a desire to gratify them, he prepared the instrument beforehand, and upon the solemnization of the marriage, promptly and generously executed it, divesting himself of all right of property in her estate, which he had but that instant acquired. This view of the circumstances which led to the making of the deed, and under which it was executed and placed in the hands of the trustees, tends to the removal of all conflict in the statements of the parties concerning it.

The next question then is, upon the character of the order of Mrs. Cruger upon Halliday, the acting trustee and agent of the estate, under date of the 15th July, 1833, by which he was authorized to pay to Mr. Cruger the *income* of the estate as it should accrue. Was this a mere authority for him to receive the income as being still the money of the wife, or is it to be regarded as an *appointment* under the deed of settlement, irre-

vocable in its nature, and by which the income of the estate was given back to the husband as his own? He claims for it the character of a *gift* to him of the *whole income*, made in fulfilment of a verbal declaration of hers to that effect, on the evening of the marriage, in consideration of his having executed the deed of settlement. Her answer, called for upon oath, and responsive upon this point, denies that such was the origin and object of this order. She says that, feeling gratified by his conduct in executing the deed, and having previously intended to allow him to enjoy the income of her property, in case he should survive her, she called upon some of the persons present on the occasion of their marriage, to witness her declaration that if she should die before having an opportunity to make a will, it was her will that her husband should enjoy the income of her property during his life. And she positively denies that she made, or intended to make, by that act or declaration, any other gift or disposition in favor of her husband than by a verbal or nuncupative will, to take effect at her death, in case he should survive her.

That the purport and design of her declaration, so made, was *testamentary*, was placed beyond all doubt by the concurring testimony of the Rev. Dr. Phillips, the Rev. Dr. Wainwright, and Mr. Monroe. They prove that it was expressed as her *"will,"* to take effect in the event of her death suddenly occurring before one in writing could be prepared. Her husband had just parted with all his interest in her property, and she wished to guard against a contingency, by which he might be deprived of all benefit from the income of the estate which she intended he should have during his life, in the event of his surviving her. Such a disposition of the net income would, of course, take effect only at her death; a thing very different from a gift, or an intended gift, to take effect or become absolute in her lifetime. She denies, moreover, in her answer, that the proposed nuncupative will had any connection with the subsequent giving of the order of the 15th of July, or that the latter was in confirmation and fulfilment of the alleged gift of the income made by the former, or intended thereby. I am bound to believe her

Cruger *v.* Cruger.

statement in this particular, because it is responsive to a direct allegation of the bill, and the denial is not disproved by any evidence in the cause.

The answer likewise explains the circumstances under which the order was made, and states her reasons and motives for it; all of which are perfectly in keeping with the idea of its being a mere matter of business arrangement between herself and husband, and not a gift of the income to him.  She appears to have been made aware of the embarrassment that might arise from her undertaking to make deposits in bank on her separate account, and to draw checks in her own name; and deeming it to be (as she very properly might) the more appropriate duty and business of her husband to look after her income, and to attend to the disbursing of it in their personal and family expenses, and being anxious at the same time to save his feelings from all seeming distrust, and to show how unbounded was her confidence in him, she subscribed the order in the very significant and feeling manner expressed upon its face.

Some effort has been made to support the husband's claim under the order, as a purchase of the income, founded on the consideration of his relinquishing a lucrative profession on entering into the marriage; and on the other hand numerous facts and circumstances have been adduced in argument to prove that no such idea could have existed at the time, nor for a long time afterwards, even in the mind of the husband himself; and that his letters on various occasions, and his acts and proceedings during a series of years, are opposed to any such construction being given to the transaction.  There is much force in the argument drawn from these sources, but it is unnecessary to dwell upon them here.  An attentive consideration of all the circumstances has satisfied me that the order of the 15th of July, 1833, was not given as an *irrevocable appointment* of the income to the husband, in effect restoring to him his marital right in the property, and that such is not the true character, and was not the intention of it.

Thus far, then, we find that by the husband's deed of settlement the whole property, capital and income, was secured to

Cruger *v.* Cruger.

the wife, and by her order a stewardship was created in the husband, over the income, which involved in itself the duty of keeping accounts. This duty, in fact, he undertook to perform; but it appears soon to have become irksome to him. At the second anniversary of their marriage, the discovery was made that the sums drawn from the trustees, and expended, had exceeded the income. This circumstance, and the trouble of keeping minute accounts, led to dissatisfaction, and produced some difficulty. It was a cardinal rule with Mrs. Cruger not to allow the capital of her estate to be encroached upon, or diminished; and although the husband, immediately upon its being discovered, made good the deficiency out of his own resources, it showed the necessity of more economy, and a closer attention to the keeping of accounts. The latter duty had a tendency rather to increase than to remove the cause of his discontent. This is shown by his handing back to her the order, with liberty to her to revoke it if she pleased. She, however, did not revoke it, but addressed to him a note, under date of 29th of June, 1835, by which she proposed to relieve him, in some measure, from the trouble of keeping minute or detailed accounts, and to allow him to retain a specified part of the income, for his own sole use, and without any accountability to her for it.

The terms thus proposed, she offered to confirm by orders or directions to her trustees. All this was done, as she says—and she speaks responsively—not for the purpose of creating an irrevocability about her former order, but to lessen his dissatisfaction, and to silence his murmurings about keeping full and particular accounts, and to render the manner of receiving and disbursing her income more agreeable to him. I do not see, therefore, that the rights of the parties, as they existed previously, were materially changed by this act of hers of the 29th of June, 1835.

The original order, which he offered to surrender, appears to have found its way back into his hands, and all things went on harmoniously between them until another year had elapsed. At this time (towards the last of July, 1836,) fresh difficulties

Cruger *v.* Cruger.

arose. For causes either real or imaginary, which she has set out in her answer, she withdrew the agency of the estate from Mr. Halliday, the acting trustee, and took from him the duplicate of the order of the 15th of July, 1833, which had been deposited with him, and appointed Mr. Brown agent of the estate, in the place of Halliday; and this change was made without previously notifying her husband of what she was about to do. Of course it was a surprise upon him, and he became greatly excited by it; so much so that he left their residence, and took lodgings elsewhere. Then, for the first time, the question seems to have come under discussion between them, whether the order she had recalled was revocable or irrevocable; and it resulted, after a few days' separation, in his writing a note addressed to Mr. Halliday and Mr. Monroe, as trustees of the estate, dated 8th of August, 1836, in which he says that under Mrs. Cruger's assurance that she did not intend the order for the payment of the income to him to be irrevocable, he of course had not the right to have it so considered. This removed at once all cause for his separating from her, and he accordingly returned; having determined to meet her, as expressed in a letter to her at the time, upon her own terms, viz. to "trust in her confidence, affection, honor and generosity." After this reconciliation the parties spent a part of the autumn of that year (1836,) together at Henderson, their country residence, in Herkimer county, from whence they returned to the city some time in November.

The subject of Mr. Cruger's dependant condition was now again renewed as a matter of discussion between them, attended by importunity and a course of conduct towards Mrs. Cruger (of which she complains,) in order to induce her to make some settlement of income upon him, by which he might be relieved from the state of dependance and uncertainty in which he was placed. With a view to some arrangement to that effect, the friendly offices of Mr. Bard, and Captain Whetten, were accepted as arbiters, and their opinions and advice as to the basis of a settlement, dividing the income, were given, but without effect. Nothing came of it, or of certain papers which

he caused to be prepared, about the same time, and requested her to unite with him in executing, but which she refused to execute. Comparative peace and quietude, nevertheless, appears to have been restored to the minds of the parties at that period, by a solemn declaration which Mrs. Cruger made in writing, addressed to her sister Mrs. Monroe, under date of November 30, 1836. This paper embraced the most important points in the controversy between them. Mrs. Monroe gave it her sanction and approval, Dec. 20, 1836, in these words: "I truly believe my sister in the declarations made in this letter, and that she will strictly adhere to them throughout her life." Captain Whetten also expressed, in writing, his entire confidence in them.

From this time until the autumn of 1839, a period of about three years, the parties appear to have lived happily together, nothing having occured to disturb the harmony between them. A portion of the years 1838 and 1839 they spent in Europe. On their return they went to Henderson, and passed the summer of 1839 at that place. In the autumn, on coming to town, a difficulty again arose about the income, in consequence of the dishonor of a draft which Mr. Cruger had drawn on Brown, the agent, for money to pay debts or expenses incurred at Henderson ; she having given some instructions to the agent which the agent supposed forbade his acceptance of the draft, though the draft was very soon afterwards accepted and paid. This circumstance induced a renewal of the importunities and demands upon her for a settlement which should place something irrevocably at the disposal of Mr. Cruger. She was urged to this by her brother-in-law, Mr. Monroe ; and she finally yielded so far as to sign an instrument addressed to Mr. Monroe, dated 26th of October, 1839, by which she declared that her husband's power to draw the whole income, as it accrued during his life, should be deemed irrevocable. And this was followed up by her executing a deed of the 2d of November, 1839, which purported to settle upon her husband the whole income of the estate, real and personal, during his life, excepting the share which belonged to her of her deceased mother's

and sister's estates, upon this being done, the husband executed a deed of appointment on his part, dated the 5th of the same month, referring to her deed of the 2d, by which he directed the trustees to pay to her so much of the income as would, with what she had reserved to herself, constitute one half of the whole income of the estate.

These instruments, however, proved entirely unavailing. Mrs. Cruger had intimated at the time of executing the deed on her part, that her husband's acceptance of it would be the means of separating her from him. The declaration was made in pursuance of a determination long previously formed, and never meant to be departed from, that if constrained to give him an irrevocable power over the income she would not live with him while he held it. The prediction was verified; for, on his coming to town, after exchanging the papers, he found that she had left their house and had gone to their brother's, and that she refused to return and live with him, so long as he retained the deed and claimed any rights under it. This state of things continued until the 22d of February, 1840, when Mr. Cruger, being at Washington, endorsed upon the deed a surrender and cancellation of it and sent it to her. From Washington he proceeded to Charleston, South Carolina, where he remained until the following June. He then came back to New-York, and found Mrs. Cruger had gone to Henderson, where she remained apart from him all the summer. Now again the friendly advice of Mr. Bard was offered, in a letter addressed to her, expressive of much good feeling and concern for the happiness and honor of both, and strongly urging her, for both their sakes, to make a settlement of some portion of the income upon her husband, that should be permanent and irrevocable. She promptly replied to Mr. Bard's letter, placing at his disposal the whole of her then income, so that he might decide what portion of it should be assigned irrevocably to Mr. Cruger; and after he had decided, then authorizing him to have the proper instrument prepared and forwarded to her for execution. A deed of the 7th of September, 1840, was accordingly prepared and sent to her, which she executed and re-

Cruger *v.* Cruger.

turned to Mr. Bard, and the same was thereupon delivered to her husband. By this deed she assigned to him out of her income, an annuity of three thousand dollars, to be paid to him during his natural life. Notwithstanding this deed had all the appearance of being a perfectly free and voluntary act on her part, and, as he says, was intended as an adjustment of all difficulties between them, and to bring them together again, yet it would seem from her statements, that she executed it without any view to cohabitation, and that she still meant not to depart from her purpose of living separate, provided he accepted the deed, and should undertake to claim an irrevocable power over even so much of her income. If such was her resolution at that time, it is certain, however, that she did not long adhere to it. On his proceeding to Henderson, soon after receiving the deed, she became reconciled, and they were again united; so that in November following they came to town and took up their residence for the winter at her house, 55 Broadway, where they continued to reside in external harmony until some time in June, 1841.

Then it was that she again separated from him, and they have not since resided together. The immediate cause of this, their last separation, does not very distinctly appear. A variety of circumstances may have contributed to it. Mrs. Monroe, who was present when she left, says it was owing to some misunderstanding about money matters; that neither Mr. nor Mrs. Cruger seemed to understand each other's views on money matters; that Mr. Cruger expressed his disapprobation of her going—opposed her going, but nevertheless handed her to her carriage. But it is not very important, at present, to ascertain more particularly the cause. I only advert to the fact of their separation, in connexion with other prominent matters that have occurred since 1835, in relation to the husband's acquiring an interest in or a control over the income of her estate, in order to come at that part of the case which I am now about to consider, and upon which the right and claim of the husband to any interest or ownership in the property entirely depends. I refer to her deed of appointment, of the 19th of

November, 1841, the last she ever executed, and by which, ac-
cording to its purport, she irrevocably assigns, transfers and ap-
points to her husband, in pursuance of the power contained in
her post-nuptial settlement with him, (meaning his deed of the
29th of June, 1833,) the one equal half part of the net income
of all her estate, real and personal, for and during the rest of
his natural life, from and after the first day of November then
instant, and directs the trustees of her estate to pay to her
husband such moiety of the income accordingly, declaring the
provision thereby made to be in lieu of the annuity of three
thousand dollars.    This deed is a matter of vital importance
to the husband, provided I am correct in my views as to the
validity of the original deed of settlement, and as to the effect
of the order of the 15th of July, 1833.

If found to be a valid instrument, both upon the law and
the facts of the case, then he is entitled to the aid of the court
in carrying *its* provisions into effect.    But should it fail of sup-
port, so necessary to its validity, then there is nothing left for
the husband to fall back upon, within the province or jurisdic-
tion of this court to enforce, unless, indeed, the court can rein-
state the annuity which was surrendered when the deed in
question was delivered; the grant of which annuity, however,
is now as strongly impugned as is the deed which succeeded it.
The form of this last instrument, as a deed of appointment, is
not objected to ; but it is insisted in the first place that Mrs. Cru-
ger had not the capacity legally to make such a deed, or any
other instrument purporting to convey or to dispose of the in-
come.    The *power* as expressed in and intended to be confer-
red by the husband's original deed of settlement is broad enough
to authorize her to dispose of the income as well as the princi-
pal, either by deed or will; and it is that sort of power which a
married woman, notwithstanding coverture, is expressly author-
ized by the statute of powers, to execute by herself, without the
presence or concurrence of her husband.    (1 *R. S.* 735, § 110;
*id.* 737, § 130.)    But the objection lies deeper.    It is based up-
on the disabling or prohibiting language of the 63d section of
the statute of uses and trusts, which it is contended renders

her legally incompetent thus to part with or dispose of her income. That section does indeed declare that " no person beneficially interested in a trust for the receipt of the rents and profits of land, can *assign* or in any manner *dispose of* such interest;" though where a trust for the payment of a sum in gross is created, the right and interest of a beneficiary may be assigned. This provision of the statute applies only to rents and profits, or to sums in gross payable out of real estate; although by a subsequent statutory provision, the income of personal property is placed upon a similar footing, and subjected to the like rules. (8 *Paige*, 85.)

The question is therefore presented whether the deed in question is such an assignment or disposition of the income as the 63d section has prohibited and rendered nugatory. The law having authorized the creation of trusts, and especially trusts for the purposes specified in the 3d and 4th subdivisions of section 55, it became necessary to throw around them some guard against an improvident disposition which the beneficiaries of such trusts might be tempted to make of what was intended for their *continuous* support, and to meet their constantly accruing and future wants, such beneficiaries being generally persons of improvident habits, or under some condition of helplessness or dependence; and hence the 63d section was enacted. It was probably intended, moreover, to support and give effect to the clause *against anticipation,* commonly introduced into deeds and wills, creating settlements for the separate use of married women, as to the effect of which clause, nice and difficult questions were liable frequently to arise. (*See Kent's Com. 5th ed. and* 1 *Beaavn,* 1.) No such clause appears, however, in the deed in the present case; and the other branch of the mischief which it was the policy of the 63d section to guard against seems to be equally inapplicable and foreign to the present purpose. The effect of the deed appointing one half of the net income to the husband is not to break up the trust; for the object of the trust is not thereby essentially or materially changed. The trust is still to endure. The trustees are to go on receiving the rents and income and making the application

thereof in moieties, according to the directions she has given, and the appointment she has made, all of which is in conformity with the power conferred upon her. This is very different from a sale of her interest under the trust. It is not a parting with the continuous and constantly accruing benefit it was intended to be to her, for a benefit in *gross,* or an *anticipation* of all the benefit of the trust and a termination of it, so far as she is concerned.

The opinion expressed by the chancellor in *Gott* v. *Cook,* (7 *Paige,* 538,) and by Mr. Justice Cowen in *S. C. in error,* (24 *Wend.* 667,) appears to me to favor the distinction which I make between putting an end to the original beneficiary's interest under the trust, thereby virtually defeating the object of it, and the doing of that which is only an appropriation of the benefits resulting from it, in a manner compatible with its object and its creation. I think the latter is the sense in which this deed is to be regarded, and, consequently, that it does not fall within the prohibition of the 63d section.

The other objections taken to the deed depend upon the circumstances under which Mrs. Cruger was induced to execute it. She states in her answer, (and in her cross-bill the charges are substantially repeated,) that having returned to the city on the 18th of October, 1841, from her country residence, she went immediately to the house of her cousin, Mrs. Kane, where she met Mr. Cruger, and had a very painful interview with him. That at that time, as she believes, he had made up his mind to live separately from her, and to obtain as large a grant as practicable of her income, and for this purpose he engaged the services of Mr. Monroe, her brother-in-law. That Mr. Monroe, accordingly, alone, or conjointly with Mr. Cruger, instructed Mrs. Monroe, her only surviving sister, to procure from her an appointment of one half of the income to the use of Mr. Cruger. That all the acts and proceedings of Mrs. Monroe to accomplish that object were guided by Mr. Cruger, either directly, or indirectly, through the agency of Mr. Monroe. At the same time, by some indirect means, Mr. Cruger procured Mrs. Kane and Mr. Ogden to aid and assist him in his designs upon the in-

come. That Mrs. Monroe, aided and seconded by Mrs. Kane and Mr. Ogden, addressed her and requested that she would settle upon Mr. Cruger one half of the income of her estate. To this she replied that by virtue of an offer made in June previously, through her counsel, Mr. Strong, and still subsisting, Mr. Cruger had the liberty to take nearly the whole of the income, and it was therefore unnecessary to apply to her for a smaller sum. (The offer in June, alluded to, involved a condition that, if accepted, she would live separate from him, and had therefore been rejected.) That her sister, Mrs. Monroe, treated such reply with ridicule and derision, stating that she had no right to give the whole, but was bound, in order to save herself from general censure, to give one half. That Mrs. Monroe, so aided and seconded by Mrs. Kane and Mr. Ogden, pursued the application for a settlement of one half of the income upon Mr. Cruger, so unceasingly, and in so harassing and importunate a manner, as to leave her no peace or quiet. That she resisted the importunities of her sister to the utmost of her ability; but at length her powers of resistance wholly failed her, and she yielded to the requisition of Mrs. Monroe, and directed her counsel (Mr. Strong) to draw the required settlement. She further says, that Mr. Strong accordingly drew up an instrument, bearing date the 26th of October, 1841, purporting to settle one half of the income upon Mr. Cruger for her life, instead of his life, which she executed, but which he refused to accept or receive. That in this stage of the controversy she was again addressed by her sister, aided by her cousin and Mr. Ogden—that she was charged with duplicity in giving private instructions to her counsel to draw the instrument in such unsatisfactory form, and was censured for unreasonable obstinacy, and threatened with public odium; and with renewed and continued importunities, she was at last compelled, in order to secure her tranquillity, to agree to make the settlement upon her husband, of one half of the income during his life. That having so yielded she sent for Mr. Strong, and caused instructions to be given to him to prepare the deed of settlement accordingly.

Cruger *v.* Cruger.

That the draft was prepared and submitted to Mr. Cruger, who, instead of acquiescing in it, proposed a different deed of settlement, but on being informed that his proposed deed would not be executed, he finally, after considerable hesitation, and on or about the 17th of November, signified to Mr. Strong that he would accept as satisfactory the deed prepared by him; whereupon it was engrossed, and she executed and acknowledged it, under date of the 19th of November, 1841, and sent it to Mr. Strong, who delivered it to Mr. Cruger.

She then denies that Mrs. Monroe, Mrs. Kane, and Mr. Ogden, or either of them, had any right to suppose that the deed could or would form a basis, just, reputable, or otherwise, of a re-union between herself and her husband. On the contrary, she says it necessarily formed a cause of continued separation, inasmuch as she had *uniformly* declared that she could not live with her husband, so long as he persevered in possessing himself of a legal right to any part of the income of her estate. That in the summer previous he had declined to receive a settlement on the condition that she was to live apart from him, and yet in order to secure the co-operation of her sister and cousin, and to avoid the odium of accepting a settlement on such disreputable terms, he held out to her sister and cousin the idea that such settlement, when made, would satisfy his mind, restore harmony, and thus lead to a re-union between them; at the same time he well knew that she had determined not to live with him under such circumstances. She then says that the deed was not a free and voluntary act on her part; that it was obtained in opposition to her will, and by the persevering and vexatious importunities of her husband and his agents; that it was obtained fraudulently, against good faith, and contrary to the true intent and meaning of what she claims to have been an ante-nuptial agreement and the husband's deed of 29th of June, 1833. That although no physical force was employed to compel her to execute the instrument, and admitting as she does that at the time of executing it she was under no personal restraint or duress, and that she executed and acknowledged it with all the form and ceremony of a free and

Cruger *v.* Cruger.

voluntary act, yet she says it was by undue persuasion and co-ercion, growing out of his importunities and persecution of her for years, and his threats that he would continue to destroy all her peace, comfort, and happiness, until she made such a set-tlement of her estate upon him as he should be content to accept, that she was brought to execute it.

Such are alleged to have been the means resorted to, and practised upon her, to obtain the deed. If true, there can be no doubt as to the duty of this court in regard to the transaction. The deed could not be allowed to stand; much less would the court lend its aid in carrying it into effect. And here I may remark that much of what is thus alleged against the *morale* of the deed is either in denial of, or responsive to, statements put forth in the original bill calling for an answer under oath. The burthen of disproving these denials and responsive asser-tions, therefore, rests upon the husband; and to this end he has called upon Mr. and Mrs. Monroe, and Mr. Ogden, for their testimony respecting the part taken by them, as well as by Mr. Cruger himself, in bringing about this arrangement and deed of settlement. Although these three witnesses are the persons chiefly implicated as conspiring with Mr. Cruger in this business, yet they are competent to testify, and their testimony must be believed, unless there is other evidence to refute their state-ments, or upon the face of their own testimony it shall appear to be incredible.

Both Mr. and Mrs. Monroe freely admit, in the course of their lengthy and searching examinations, that often, and on various occasions during a series of years prior to the separation of the parties in June, 1841, they did interfere, and by their advice and influence endeavored to prevail on Mrs. Cruger to make a permanent and irrevocable settlement upon Mr. Cruger of some large portion of the income of her estate. That this they urged upon her frequently when the subject of her income became a matter of discussion and controversy between them, so as to threaten the loss of her domestic peace and happiness, and to become painful to the feelings of those so nearly and dearly connected with her as were Mr. and Mrs. Monroe and family;

that this was done both verbally and by written communications, in the most urgent and persuasive manner, but was always most kindly meant, from a belief that her own happiness would be promoted by it, and from a wish to see her placed upon high ground with respect to her husband and the opinion of the world.

When Mrs. Cruger came to town in October, 1841, and did not go to reside with her husband at 55 Broadway, where he then was, these efforts were renewed by Mr. and Mrs. Monroe, and particularly by the latter, in the hope of inducing Mrs. Cruger to make the settlement, and return to and reside with her husband, and thereby conform to the wishes of her best friends. Mrs. Monroe is asked, upon her cross-examination, to give the substance of the conversations which it appears she had with Mrs. Cruger on that subject, two or three times shortly after she came to town, partly at Mrs. Monroe's house, 30 Varick-street, and partly at Mrs. Kane's, 52 Varick-street, at one of which she thinks Mr. Cruger was present, and also Mrs. Kane, and at another Mr. Ogden and Mrs. Kane were present. She says the conversations were not very long, at least not all of them. She did earnestly entreat her sister to make the deed and place herself on high ground. It was her sister she thought of, to make right. The conversation most deeply impressed on her mind was one held in Mrs. Kane's house when she said, " My sister, only do right ; put yourself on high ground, and divide your income with Henry, giving him half that you cannot take back ; then try, and if you are not happy with Henry, and he not contented, I will give him up and go to you." In answer to a further interrogatory, she says she expressed herself to this effect : " Mrs. Kane, Mr. Ogden, Mr. Whetten, every one of us that loves you, wishes you, Harriet, to do this—do, Harriet, for all our sakes." She further says—" I did not say to her, ' You cannot maintain your own respectability or that of your relatives, without making it.' I had no view but for my sister. I urged her, from the bottom of my heart, to do what I asked of her. I used no argument but affection." In relation to the charge that these efforts of Mrs. Monroe to procure a deed from her sister, were stimulated

by Mr. Cruger, through the instrumentality or agency of Mr. Monroe, who instructed, guided, or directed his wife's movements in that respect, Mr. Monroe expressly declares that Mr. Cruger never at any time engaged his services or secured his agency, to obtain for him half of the income of Mrs. Cruger's estate, or that he alone, or conjointly with Mr. Cruger, ever instructed or directed Mrs. Monroe to procure from her sister such a grant. He says that at no time whatever did any thing pass between himself and Mr. Cruger on the subject, except when he spoke to Mr. Cruger about having some arrangement made that should be definite and unchangeable respecting the income; at which times Mr. Cruger declared himself disposed to leave the whole matter to Mrs. Cruger and her friends. He says, moreover, that in the frequent conversations between himself and Mrs. Monroe he found that their views corresponded in relation to Mrs. Cruger; and that he never did advise Mrs. Monroe to use her influence and powers of persuasion with Mrs. Cruger, to effect any object with her; that Mrs. Monroe would attempt nothing of that sort which was not in accordance with her own views, and her own feelings of affection towards her sister; that whatever he, Mr. Monroe, had done towards influencing or persuading Mrs. Cruger into a settlement, was done out of regard for her and her happiness; and most generally without the knowledge or concurrence of Mr. Cruger, except that Mr. Cruger had always declared that he would cheerfully concur in any thing her friends might decide upon.

It is unnecessary, for the present purpose, to go more at length into the testimony of these two witnesses. What I have thus stated comprises the substance of all that I deem material to show the character and kind of influence which they appear to have exerted with Mrs. Cruger, in producing the results complained of by her.

The testimony of Mr. Ogden, in regard to the character of his interference and advice, is not very different. He, it appears, was an old and intimate friend of the Douglass family; one who could have had no motive for advising Mrs. Cruger in any thing, except in that which he honestly and sincerely believed

to be right, and promotive of her happiness and welfare. He was in New-York during the whole of October, and as late as the 10th of November, 1841 ; on which day he embarked for England. In October, and at least a fortnight before he sailed, he met Mrs. Cruger, at Mrs. Kane's, in Varick-street. It was in the evening. Mrs. Monroe was also there. He had taken leave of the ladies. Mrs. Cruger followed him to the door, and as he was on the steps going away, she urged him to return and converse with her on the subject of her existing difficulties with her husband, and to give her advice. At her pressing solicitation, resisting it, however, for some time, he agreed to listen to her story, and did return into the house, and had a long conversation with her. Mrs. Kane and Mrs. Monroe were present. The conversation most to the point, he says, was her declaration that she had always intended to settle the whole of her income upon her husband, revocable at her pleasure. He, Mr. Ogden, gave it as his opinion that a certain part of her income, or a certain sum, should in justice be settled on her husband during his life. After a great deal had been said, she agreed that the settlement should be of one-half of her income, and solemnly declared that she would carry it into effect. She said, " Mr. Ogden, I will sit down this very night and write orders to my solicitor to do so." He told her that such haste was unnecessary ; that to-morrow, or the next day, after she had reflected on it, would answer the purpose. " I repeatedly told her (he continues) that my only cause for giving this advice was my friendship to her, and to set her right before the world. I told her that I frequently had heard it the subject of conversation, and that she was blamed for the conduct she had pursued. We parted, on this occasion, on the most friendly terms." He further says, on his cross-examination, that in the course of the conversation he told Mrs. Cruger that he was speaking to her as *her friend*, and not as the advocate of Mr. Cruger, in whom he felt no comparative interest ; that the advice he gave her was from a conviction in his mind that it was right, and that he gave it to her that she should be enabled to take a high stand before the world. In answer to the question, " Did you,

at that time, advise that the settlement should be for his (Mr. Cruger's) life?" he says, "I did most distinctly;" and he was led to do so from a belief that no permanent amicable adjustment could be made which rested on the sole will or caprice of the party making the settlement.

It was in pursuance of this advice that Mrs. Cruger gave directions to Mr. Strong, her solicitor, to prepare the deed which was drawn and signed by her under date of the 26th of October, 1841, purporting to be for her own life, and which was rejected. Afterwards, and on the 8th or 9th of November, Mr. Ogden had another interview with Mrs. Cruger at her brother's (Mr. William Douglass') house in Park Place. He there entered into a further conversation with her, in which he told her that he had understood a deed had been made out in favor of Mr. Cruger during her life, and inquired whether she understood that to be the meaning of the advice he had given her. She replied that in the directions to her solicitor she had not ordered him to make out the papers in that way. He then remarked, in that case the solicitor was unworthy of her confidence, as he had presumed to make a change in her intentions. She persisted, however, that the papers should continue as they were drawn. On that account the conversation became an animated one. Mrs. Cruger was greatly excited, walked the room, and expressed herself very strongly, and in terms highly derogatory to the character of her brother-in-law, Mr. Monroe. To which the witness replied with some warmth, though in other respects he says he spoke plainly in the language of truth, without passion or feeling. In reply to her exclamation that "all the world had turned against her, and that I, even, had joined her enemies," he said "No, Mrs. Cruger, you are your own worst enemy; if any friend, however dear to you, ventures to differ in one single point from your opinion, you set them down at once as an enemy." The witness says further it was an angry conversation towards the close of it. It can hardly be said to have terminated amicably, for she persisted in her intentions, and he had his views on the subject, which were opposite to those entertained by her. Up to the time he parted

with her he understood that she did not yield her assent to making the settlement for his (Mr. Cruger's) life.  Her brother, William Douglass, and Miss Bleecker, were present during the conversation, but took no part in it, of any moment.

With regard to this last interview, it appears to have been brought about solely at the instance, and upon the invitation of Mrs. Cruger.  Mr. Ogden did not seek it, nor does it appear that Mrs. Kane, Mrs. Monroe, or Mr. Cruger were at all privy to it.  Mr. Ogden had shortly before heard, through Mrs. Kane or Mrs. Monroe, or both of them, (between the 1st and 8th of November,) of the making and tender of the deed of the 26th of October, and had expressed his astonishment at its being limited to her life; but has no recollection of having seen or conversed with Mr. Cruger on the subject between the time of the first and last conversations with Mrs. Cruger, or of having seen Mr. Cruger and Mrs. Monroe together during that interval.

It appears moreover from Mr. Ogden's testimony, that in the summer of the preceding year, (1840,) he had visited Mrs. Cruger at Henderson, upon her invitation, and there the subject of a settlement and adjustment of the difficulties with her husband were discussed; and at which time he had very frankly  . expressed his opinion in favor of a settlement of a part of her income upon her husband, that should be irrevocable, as the only means of reconciling them, and of enabling them to live amicably together, and had advised her against making a settlement of the income during her pleasure, as she repeatedly said it was her intention to do.  To the question, "Did Mr. Cruger at any time request you to exert any influence with Mrs. Cruger on the subject of those difficulties?" the witness answers "Never!  It was at the solicitation of Mrs. Cruger alone, and as her friend, that I gave the advice."  The question thus put and answered relates to every instance in which Mr. Ogden· conversed with Mrs. Cruger, and gave advice in relation to her difficulties and the best mode of settling and avoiding them in future.  So far as he was instrumental in the matter, and so far as his advice or opinions may have influenced her to make a settlement of one-half of her income, and to

Cruger *v.* Cruger.

make that settlement irrevocable, and that too for her husband's life instead of her own, Mr. Ogden certainly exculpates Mr. Cruger entirely from all agency in bringing that influence to bear on her mind. The same may be affirmed of the testimony of Mr. and Mrs. Monroe, in respect to the part which they took, either conjointly or separately, to induce Mrs. Cruger to make such a settlement. Neither of the three acted with any view to serve the mere selfish purposes of Mr. Cruger, by procuring for him one-half of the income of the estate. It is impossible to believe that they, who stood in the relation that these parties did to Mrs. Cruger, including Mrs. Kane, her intimate friend and near relative, could have been actuated by such a motive, even if they had not told us of higher and nobler motives of action, proceeding from feelings of friendship and affection towards Mrs. Cruger, and from a desire to serve her in that which would contribute most to her welfare, her own domestic peace and happiness, and secure to her the high stand which she had all along occupied in society, and before the world, and in the estimation of her numerous friends. To this end, and from such motives, they were induced to exert their influence, and to persuade Mrs. Cruger to make such a deed of settlement as she finally executed. In so doing, they appear to have been governed by considerations altogether personal to Mrs. Cruger, intending to benefit her, though at the same time it could not fail to benefit her husband; yet he was not, nor were his interests, the object of their solicitation. He was but a passive party, ready to abide by whatever should be done by her that her friends might sanction and approve.

It is true Mr. Cruger was so far active as to reject the deed of the 26th of October, but that was because it was not in accordance with the agreement and the solemn promise she had made. It is true moreover, that he proposed the form or draft of a deed, such as he understood had been determined upon; but finding her unwilling to execute any other than her solicitor should prepare, he yielded, and accepted the deed of the 19th of November. Under these circumstances can it be said that Mr. Cruger succeeded in obtaining it by undue means?

Cruger *v.* Cruger.

That he took no active measures to obtain it, seems to me abundantly proved ; and the leading charge of the answer, that he enlisted her friends in his service, prevailed on them to interfere and exert their influence, and finally, through their instrumentality, guiding and directing their movements, succeeded in bringing about the result, so far from being supported by any evidence, is, in my judgment, completely disproved, not only by the positive testimony which I have quoted, but by strong presumptive evidence which the circumstances of the case, the relations which the parties implicated stood in towards Mrs. Cruger, and their highly respectable and honorable characters unquestionably furnish. There is no ground, therefore, for imputing to Mr. Cruger the exercise of any undue influence, coercion or misconduct, in obtaining the deed, either by himself or through the medium of other persons instigated by him, or whose officiousness he had secured.

The question still remains, however, whether, executing the deed under the advice and pressing solicitations of her friends, urged upon her in the manner they have described, and from motives like those before mentioned, she is at liberty to retract and avoid it? In looking at the transaction with a view to this question, it must not be forgotten that there was a dispute, mainly attributable to the want of a proper formal and permanent marriage settlement. This dispute had before produced temporary separations ; and now again it had resulted in a separation which threatened to be more lasting, and in which the wife herself had chosen to be the party to leave her house and to keep herself aloof from her husband, he remaining, ready to receive her whenever she might return. In the hope of bringing about a re-union and restoring harmony, her near relatives, and other intimate and personal friends of hers, interpose their kind advice, or she seeks advice from them. Their advice she determines to be governed by. She nevertheless wavers, and at length recedes. Her friends chide and entreat and importune, until she is brought back to her first resolve. She then executes the deed, and acknowledges it in a deliberate manner, before a proper officer, and in the presence of a

brother, who must have known most, if not all, of the circumstances which led to it; and he and a sister-in-law sanction the act by their subscription as witnesses. Her husband was not present to overawe her. Her importunate friends were not then surrounding her—one of whom was on his way to England. At that time she was free to act as she pleased; unconstrained, except so far as she may have felt bound in honor and conscience to fulfil the promise she had made to them, or was afraid of again incurring their displeasure by refusing to execute the deed. If the former was the case, she can hardly be allowed to say that she executed it against her will, and the convictions of her own mind; and the latter will avail but little as an excuse for one who is proved to be " remarkably pertinacious in her opinions, not easily persuaded, and certainly not to be intimidated from them."

The deed, moreover, is but a reasonable settlement of this family matter. There is nothing inequitable or unconscionable in its provisions. Such a deed, free from fraud, though a voluntary one, yet made with a view of effecting a family set tlement, a court of equity will seek to uphold, rather than to destroy, for obvious reasons of public policy, as well as for the sake of the peace of families.

Though the deed has not been attended with the good results which were expected from it by her friends, but has rather had the effect, as it would seem, to estrange her the more from her husband, and in some degree to sever the ties of friendship and affection between herself and sister, yet this furnishes no argument against the validity of the deed, nor any sufficient ground for not giving immediate effect to it. All this may have proceeded from some idiosyncrasy of mind that time may overcome; and the day may possibly not be far distant when the object of her friends, in recommending this deed of appointment may be fully realized, notwithstanding the assertion in her answer that they had no right to suppose it would form the basis of a re-union between her and her husband, since she had uniformly declared that his acceptance of an irrevocable power over any part of her estate, or its income, would be the cause

of a continued separation on her part. A re-union, however, was but one of the objects they had in view. If that failed, there was another, which would be accomplished by her settlement of one-half of the income upon her husband. It would show her generosity and magnanimity, and in that respect, " set her right before the world."

There is another point in respect to Mr. Cruger himself, which must be briefly noticed. He is charged with obtaining the deed *fraudulently*, and in *bad faith*, well knowing that it would not be the means of restoring harmony between them. This is answered by the evidence, showing that he was but a passive party, and had no hand in procuring it, other than as a mere recipient, when the deed was offered and sent to him. But the charge of fraud and bad faith goes farther. His mere acceptance of the deed, and his attempt to claim any rights under it, are alleged to be contrary to good faith and the true intent and meaning of an *ante-nuptial agreement*, and the deed of the 29th of June, 1833, consequent upon it. In the former part of this opinion, I have expressed my belief that there was no *antenuptial agreement* by which the property, and its income, were to be settled exclusively upon, and to the use of, the wife. And it is sufficient to say, with respect to the husband's deed of the 29th of June, that it contains in itself a power of appointment in the wife, and that there can be no fraud or bad faith on his part in assuming or claiming rights purporting to be conferred upon him by any deed executed in pursuance of such power.

In examining this important, and, to the parties, deeply interesting case, there are many facts and circumstances, scattered throughout a large mass of testimony, and numerous letters and papers made exhibits in the cause, which have given rise to much ingenious and elaborate discussion by the very able counsel on both sides. These have not escaped my attention ; but it is unnecessary to present them here at length. They relate to matters which doubtless have had an influence upon the motives and actions of the parties in this unhappy domestic controversy, and especially as inducing Mrs. Cruger to under-

take the repudiation of the deed, after having quietly acquiesced in, and abided by, its provisions for a considerable length of time.

It has been strongly put by Mr. Cruger's counsel—and there is reason to believe it, from the evidence—that this attempt is owing to the officious interference of an individual, whose calling should have led him to holier and better purposes than the fomenting of domestic strife, and the encouragement of devastating litigation. But with this I have nothing to do.

A decree must be entered, establishing the deed of the 29th of June, 1833, and the deed of appointment of the 19th of November, 1841, and holding the trustees to an accountability to Mr. Cruger for an equal moiety of the net income of the estate.

*C. O'Conor*, for the appellant Mrs. Cruger.

*Geo. Wood*, for the respondent Mr. Cruger.

*By the Court*, STRONG, P. J. That part of the decree of the late vice chancellor, from which no appeal has been taken, affirms the validity of the post-nuptial settlement, executed by the husband immediately after the marriage of the principal parties, and declares the inefficacy of the several appointments, gifts or conveyances of Mrs. Cruger in favor of her husband, intermediate such settlement and the deed of the 19th of November, 1841. The counsel for the respondent contended on the argument, that the appeal from that part of the decree establishing the last mentioned deed opened the whole case as presented by both parties in the court below for review, and that it is competent for us still to grant the relief claimed in his bill. An appeal from a part of a decree which is so inseparably connected with the remaining portion of it that the whole must necessarily stand or fall together, or which cannot be reversed, leaving the part not affected by the appeal in full force, without effecting great and irremediable injustice, might possibly bring up the whole case for reconsideration. But neither is the case here. Ordinarily, as was remarked by Chief Justice Kent, in *Sands*

v. *Codwise,* (4 *John.* 602,) " it is a rule of practice from which we ought not to depart, that when the petition of appeal recites specifically the parts of the decree of which it complains, and from which the appeal is made, the appellant," (and he might have added the respondent,) " is to be confined to those parts of the decree." Although the *validity* of the post-nuptial settlement cannot now be questioned, it is perfectly competent for us to examine its terms, to see whether they authorize the conveyance of half the income of Mrs. Cruger's estate agreeably to the deed of the 19th of November, 1841. The construction of such deed, to that extent, is necessarily involved in the appeal. Indeed it expressly includes that part of the decree which declares that such deed is a good and valid appointment under the power contained in the settlement.

By the post-nuptial settlement Mr. Cruger conveyed to trustees for the benefit of Mrs. Cruger all his estate in the property, real and personal, which belonged to her at the time of their marriage, and his powers over it; and he of course conveyed no more. The law very clearly defines what such estate and powers were. He was entitled to the possession of her real estate, and to the receipt and enjoyment of the rents and profits, during their joint lives, and to her personal estate absolutely. Of course he had the power of disposition, to the extent of his rights, subject to the equitable claim of his wife, under circumstances which it is unnecessary to mention, to a suitable settlement. By his conveyance the right to the possession, and the income of the real estate, and the whole personal estate, passed to the trustees. The power of disposal given to Mrs. Cruger, extended only to the possession and income of the real estate, although it was absolute as to the principal and income of the personal property, subject, however to such provision (if any,) of the revised statutes as may have been applicable. It follows that the husband could not convey to trustees for the benefit of his wife, the right to dispose of the fee in the real estate at any time, nor of the rents and profits after his decease. Those were unaffected by his conveyance, and remained the same as if no such instrument had been made.

Cruger. *v.* Cruger.

The deed from Mrs. Cruger, of the 19th of November, 1841, in terms conveys to Mr. Cruger, during the remainder of his natural life, the one equal half part of the net income of all and singular her separate fortune and estate, both real and personal. There are two questions as to the validity of this instrument; 1st. Whether Mrs. Cruger had the requisite power to transfer the interests which it purports to convey; and 2d. Whether it was made under circumstances to which a court of equity will give its sanction. The question as to Mrs. Cruger's power over her property, so far as it relates to the efficacy of the instrument in question, I shall consider in reference, first, to the real estate, and second, to the personal estate.

The counsel for Mr. Cruger contended on the argument that the power of Mrs. Cruger to dispose of the income of her real estate was absolute, under the 87th section of the revised statutes relating to the nature and qualities of estates in real property, and their alienation. That section provides that "a special and beneficial power may be granted to a married woman to dispose during the marriage, and *without the concurrence of her husband, of any estate less than a fee belonging to her in the lands to which the power relates.*" The settlement gives to Mrs. Cruger the power to dispose of whatever it conveyed to trustees for her benefit, by deed or will, "in all respects as if she were unmarried"—that simply unbinds the shackles of matrimony as to her rights over the property, but clearly gives her no power in addition to those which she would have possessed had she been a feme sole. Those rights were conferred by a deed in trust, and must of course depend upon its validity. The vice chancellor considers the trust valid under the 3d subdivision of the 55th section of the statute relative to uses and trusts, which provides that an express trust may be created to receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter term, subject to the rules prescribed in the first article of the title. This, if the construction be correct—and, so far as the interests of these parties in the cause are involved, it is *res judicata*—necessarily subjects the interest

Cruger *v.* Cruger.

and power of Mrs. Cruger to the provisions of the 63d section of the same statute, which declares that "no person beneficially interested in a trust for the receipt of the rents and profits of lands can assign or in any manner dispose of such interest." This was intended to prevent the many evils arising from the anticipation and premature conveyance, of such rents and profits, and most assuredly is as essential to protect the interests of married women, as of any other persons. The vice chancellor supports the conveyance of the rents and profits in this case, on the ground that the receipt of such income by the husband may be for the use of the wife. That may be or may not be so. An order to receive the rents and profits, such as was granted by Mrs. Cruger shortly after the marriage, might be of that character, because she might continue it so long as he should devote such income faithfully to the mutual benefit, and revoke it when he should squander the property for other purposes. But an irrevocable transfer of the income to him during life could never be considered in the same light. It would enable the husband, unless prevented by a court of equity, to abstract every cent of it from the use of the wife, and in effect to contravene the main object of the instrument, which was to place the income of the property under her sole control, as essential for her use and benefit. I conceive, therefore, that Mrs. Cruger's deed to her husband of the 19th November, 1841, did not confer on him any right to receive any part of the future rents and profits of the real estate.

The next question is whether, as the vice chancellor supposes, the income of the personal estate is placed by another section of the statute upon a similar footing, and subjected to the like rules. The provision of the revised statutes relied on by the learned judge, and also by Chancellor Walworth in *Clute* v. *Bool*, (8 *Paige's Rep.* 83,) is contained in the 2d section of title 4 in chapter 4 of part 2 of the revised statutes, which declares that limitations of future or contingent interests in personal property shall be subject to the rules prescribed in the first chapter of the act in relation to future *estates* in land. The chancellor thinks that the 36th section of the article rela-

tive to the creation and division of estates, constitutes the right
to receive the rents and profits of land at any future period a
future estate.   With great deference I cannot agree with him
in his construction of that section.   It provides that "disposi-
tions of the rents and profits of land to accrue and be received
at any time subsequent to the execution of the instrument
creating such disposition, shall be *governed by the rules* estab-
lished in this article in relation to future estates in lands."
Now this does not declare, directly or by implication, that such
dispositions shall be deemed future estates.   The statute could
not have consistently done so after having defined, as it does
in the 10th section of the same act, a future estate as "an
estate limited to *commence* in *possession* at a *future* day."
The right to receive the rents and profits, in this case, com-
menced at the instant when the instrument creating it was
delivered, and was clearly an estate in possession, within the
meaning of the 8th section of the same act.   The 36th section
merely declares that dispositions of the rents and profits of real
estate shall be governed by the rules applicable to future estates,
not that they shall be deemed future estates.   If it had de-
signed to constitute them future estates it would have said so
in direct terms.   The provision that they should be governed
by the same rules would then have been unnecessary.   Besides,
upon every sound principle of construction, a reference to a
term used in a statute must be in its direct and primary sense,
as expressly defined, and not in an assimilated interpretation.
And that rule is more especially applicable when, as in this
case, the express meaning will accomplish all that was designed
by the framers of the law.

It is not however absolutely necessary to decide the question
as to the alienability of the income of personal property, in the
view which I take of this case.   Mrs. Cruger's interest in her
personal property was neither "future nor contingent."   She
had the absolute right of disposal of both principal and interest.
As there is nothing in the trust deed of settlement providing
for the accumulation of the income, or suspending the absolute
ownership beyond the period of two lives in being, it nowhere

militates against any provision of the revised statutes, and is valid by the rules of the common law. The absolute right of disposal gave her the power to convey the principal, or the income only, or any part of either. The conveyance of the 19th of November, 1841, was therefore, so far as it relates to the income of the personal estate, authorized by the terms of the post-nuptial settlement.

The counsel for Mr. Cruger contended that, assuming the income of the real estate to be beyond the disposal of Mrs. Cruger, this court should divide the whole, by giving the husband the income of the personal estate which is disposable, or so much thereof as will equalize the whole between the parties, as the same stood on the 19th of November, 1841. I was at first strongly inclined against this position, considering the conveyance to be of the half of two distinct subjects; the rents and profits of the real estate and the income of the personal property. But on examining the deed of November, 1841, more thoroughly than I could on the argument, I am inclined to think that it conveys the half of the whole income, as one subject matter, and that if Mrs. Cruger had the power to convey *so much* of her income, come from what source it may, the instrument shall operate upon that part of it. I am the more inclined to adopt this construction, as it will the best effectuate the intention of the parties at the time when the transaction took place. If therefore the instrument is free from other objections, it must be adjudged to convey to Mr. Cruger the income arising from the personal estate, to the extent of one-half of the net income of her whole estate, real and personal, and no more.

It was settled in the case of *Jaques* v. *The Methodist Episcopal Church*, (17 *John. Rep.* 548,) that a feme covert having a separate estate subject to her own disposal, may give it to her husband as well as to any other person, if her disposition of it be *free* and not the result of *flattery* or *force*, or improper treatment. The remaining questions in this case are whether the conveyance by Mrs. Cruger was made under circumstances which bring it within the rule laid down in that case.

Cruger *v.* Cruger.

These are questions principally of fact, depending upon a great mass of evidence which the parties have thought proper to spread before our judicial tribunals, and measurably before the public. Much of the evidence is irrelevant, and its examination and consideration have thrown an unnecessary burthen upon the court. I have perused the whole of it, and after much consideration have come substantially to the same conclusions with the vice chancellor. The able exposition of the circumstances, made by that learned judge, saves me the necessity of stating any thing more than the conclusions which I have adopted.

It is certainly favorable to the instrument in question that it contained a *reasonable* disposition of the income of Mrs. Cruger's estate. She retained enough to satisfy all her real wants, and to ensure to her all the enjoyments and comforts of life, so far as they depend upon property. If she had more it might have either enabled her to procure a greater quantity of luxuries, or to add to an estate already sufficiently large. It could not have been considered an abuse of her power, to devote a portion of her income, what she could certainly conveniently spare, to promote the welfare and advance the interests of one whom she had solemnly promised to love, honor and obey.

Mr. Cruger seems to have supposed, at first, that his wife should have given him, irrevocably, the control and disposal of her whole income. This impression may have been created, or at any rate was strengthened, by his construction of the order given in his favor shortly after his marriage. But in this he was clearly wrong. All the property was originally hers, and she had a right, and might well have considered it a duty which she owed to herself, to retain for herself and at her own disposal, sufficient to insure to her the necessaries and comforts of life, free from the power and responsibilities of her husband. But whatever may have been his sentiments at the time of his marriage, and for some time afterwards, he eventually adopted an opinion which was, I think, under the circumstances, far from being unreasonable. He thought that it would be derogatory to him, and deservedly lessen him in the esteem of his fel-

Cruger *v.* Cruger.

low men, to be entirely dependent upon his wife even for his means of subsistence, during their joint lives, and to be liable to be left destitute at her death, should he survive her, and possibly when an old man, of all that might render life comfortable, and become the most miserable of paupers—one who had been habituated to luxurious living, and been reduced in his old age to penury and want. He preferred to all this, to pursue an honorable profession which he had adopted before his marriage, and to support himself in a manner suited to his own circumstances; and as they would not enable him to maintain a style correspondent with the income of his wife, he offered to share his more moderate means with her. In all this I think he was right; and if he endeavored by his own reasoning and the persuasion of her friends to prevail upon his wife to coincide with him in these sentiments and to act accordingly, I cannot see that he was wrong in his endeavors, or that she acted unwisely in yielding to them. If by the term "free," as used in *Jaques* v. *The Methodist Episcopal Church*, it is meant that the act of the wife should be spontaneous, the conveyance in question would not come within the principle laid down in that case. So far from adopting that instrument through the unaided impulses of her own mind, she evidently acted in opposition to sentiments which she had long cherished. But I conceive that the disposition of her income was free, within the principle, if she eventually acted through the deliberate convictions of her own mind; whether produced by her own reflections, or the suggestions and advice of her friends.

The deed was not obtained by the flattery of the husband. His expressions of regard for his wife and respect for her character were strong, but evinced nothing beyond the feelings and sentiments which a good husband should entertain for his wife. Nothing like force is alleged. Indeed it is very evident that Mrs. Cruger would never have yielded to compulsion, physical or moral. She evidently yielded, at the time when she executed the conveyance for the whole of her income, to a momentary vexation caused probably by what she considered as the importunities of her friends. But she took immediate and strong

Cruger *v.* Cruger.

measures to coerce the cancellation of that instrument, and succeeded. The deed for half her income seems to have been the result of her deliberations in her calmer moments.

It does not appear that Mr. Cruger resorted to *his* personal friends to induce his wife to make any disposition in his favor. He said in his letter to Mr. Bard, of August 6, 1836, that he was opposed to the selection of any of his friends or relatives to effect a settlement of his difficulties with Mrs. Cruger. Mr. Monroe says that Cruger always expressed his willingness to leave the whole to Mrs. Cruger and *her* friends. Mr. Monroe and Mr. Whetten, both of whom have been censured for their interference, swear that they were not selected by Cruger, nor requested by him to act in his behalf. Mr. Bard was the only relative of Cruger who gave any advice to Mrs. Cruger to make any settlement in his favor. The conduct of that gentleman was highly honorable throughout; and it is creditable to Mr. Cruger to have selected so worthy a man to settle their family difficulties.

Mrs. Cruger seems to have supposed that some of her nearest relatives preferred the interests of her husband to her own; but I can see no sufficient reason for the supposition. Her sister, Mrs. Monroe, who strongly advised, and was principally instrumental in effecting the settlement, says in her letter of August 6, 1836, "I cannot say half I feel, only, dear sister, remember you are always placed right in the middle of my heart." These are strong expressions, but the conduct of this lady, notwithstanding their subsequent disputes, evinces that they were sincere. Mr. Monroe exhibits much of the vivacity of the soldier. He was occasionally angry with his sister-in-law for not following his advice, or for some hasty expression of hers, but soon recovered his equanimity, and gave her very good, and I have no doubt sincere, advice. Mr. Whetten seems to have deservedly enjoyed much of Mrs. Cruger's confidence; but he became dissatisfied when the award made by him and his associates, and their disinterested advice, were totally disregarded. All of these friends, and others, counselled Mrs. Cruger to make the settlement in question upon her husband. She was eventually induced, and I think solely by the advice of her friends, to adopt

Cruger *v.* Cruger.

that course.   If she afterwards distrusted them for giving her advice to act contrary to her own opinions, that would not impeach the transaction, nor affect the validity of the conveyance. It is certainly a circumstance in favor of the deed of November, 1841, that it was drawn by Mrs. Cruger's counsel, and delivered through his hands.   This gentleman enjoyed so much of her confidence that he was selected by her as her friend to act with Mr. Bard in settling difficulties with her husband.   From the high character ascribed to him by the counsel for both parties, (I need scarcely say much to my own gratification,) it cannot be supposed that he would aid in effecting an unreasonable settlement.

The deed in question seems to me to be reasonable in its terms.   It was the result of an arrangement made through the advice of Mrs. Cruger's nearest relatives and friends ; was drawn by her counsel ; was executed pursuant to what appeared to be her convictions of right at the time ; and was acknowledged by her to be her free act and deed, without any fear or compulsion of her husband.   And there was no fraud or imposition practised upon her by him, or with his knowledge, or by his procurement, or at all.   There is nothing in the case which calls upon us to set it aside.

It will, I think, be proper to charge Mr. Cruger with the interest on the loans to his relatives, whether received or not. They were doubtless made at his suggestion, and as favors to him, although they received the assent of his wife.   If they are well secured he will not be the sufferer ; if otherwise it is reasonable that the loss of the income should fall upon him. The decree of the vice chancellor must be modified so far as to make it correspond with the views which I have expressed.   In other respects it must be substantially affirmed.   We shall not award costs against either party.